## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JUSTINE EISEMANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN MOODY, individually and in his | ) | Case. No.: |
| official capacity, | ) | |
| | ) | JURY TRIAL DEMANDED |
| WILLIAM CLAY, III, individual and in his | ) | |
| official capacity, | ) | |
| | ) | |
| CITY OF BELLEVILLE, ILLINOIS | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COMES Plaintiff, by her attorneys, and for her Complaint against John Moody, individually and in his official capacity, William Clay, III, individually and in his official capacity, and the City of Belleville, Illinois, an Illinois Municipality, states as follows:

### INTRODUCTION

1.      This matter arises under Title VII of the Civil Rights Act as amended, 42 U.S.C. § 2000e *et seq.*, the Illinois Human Rights Act, 775 Ill. Comp. Stat. Ann. 5/1-101 *et. seq.*, and the Fourteenth Amendment of the Constitution of the United States. Plaintiff worked as a secretary for the Belleville Police Department from July 2015 to September 2018. During her employment, Defendant Captain John Moody and other members of the police force subjected Plaintiff to repeated sexual harassment amounting to a hostile work environment. Defendants retaliated against Plaintiff for reporting and opposing Defendant Moody's sexual comments, advances,

1

discrimination, and verbal abuse. The work environment created by Defendants was so toxic it forced Plaintiff's constructive discharge from her employment.

JURISDICTION AND VENUE

2.    Plaintiff invokes this Court's jurisdiction under 28 U.S.C. § 1331, 1343(a), and 42 U.S.C. § 2000e-5 to hear and decide claims under federal law. Plaintiff invokes supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) to hear and decide Plaintiff's claims under Illinois state law.

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and 42 U.S.C. § 2000e-5(f)(1)(B)(3) because all events giving rise to this action occurred within the Southern District of Illinois.

4.    On December 4, 2018, Plaintiff cross-filed a charge against Defendant City of Belleville, IL, Chief William Clay, and Captain John Moody with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR") alleging sex discrimination and retaliation. Plaintiff received notice from the IDHR that she could file a lawsuit between December 11, 2019, and March 10, 2020. Plaintiff received her Right to Sue from the EEOC on January 10, 2020. This action is timely filed. Plaintiff has complied fully with the administrative exhaustion requirements of Title VII and the Illinois Human Rights Act.

PARTIES

1.    Plaintiff Justine Eisemann is a female person and resident of St. Clair County, IL.

2.    Defendant John Moody is a former police captain for the City of Belleville, IL. At all relevant times herein, Defendant Moody acted as Plaintiff's supervisor. At all relevant times herein, Defendant Moody acted under color of law and within the scope of his employment as an

2

employee of the Belleville Police Department. He is being sued in his individual and official capacity.

3.      Defendant Chief William Clay, III is the police chief for the City of Belleville, Illinois. At all relevant times herein, Defendant Clay acted under color of law and within the scope of his employment as the police chief. At all relevant times herein, Defendant Clay was the chief and head of the Belleville Police Department and was responsible as head supervisor for all employees, including Defendant Moody and Plaintiff. Defendant Clay is being sued in his individual and official capacities.

4.      Defendant City of Belleville, Illinois, is an Illinois municipal corporation that has the capacity to sue and be sued. Its main offices are located at 8800 W. Main Street, Belleville, IL 62223.

STATEMENT OF FACTS COMMON TO ALL COUNTS

**I.      Plaintiff's Employment Background with Defendant**

5.      Plaintiff began working for the Belleville Police Department on July 20, 2015.

6.      Plaintiff made approximately $15.00 per hour at the beginning of her employment. Plaintiff received several raises during her employment. At the end of her employment, Plaintiff made $17.20 per hour.

7.      Plaintiff was initially hired to work in the records department. Before Plaintiff's start date, she met with the secretary supervisor, Teresa Araiza and Captain Donald Sax, who was responsible for employee orientation. During that meeting, Ms. Araiza told Plaintiff the records department was "full of drama" and "crazy" employees. Ms. Araiza and Captain Sax told Plaintiff they would never place Plaintiff in the records department because they thought too highly of

Plaintiff. Ms. Araiza told Plaintiff she would work as a secretary instead and asked Plaintiff to keep it a secret until her first day of work.

8.      Thereafter, Plaintiff worked as a secretary in the Operations Division. Her job duties included writing letters, answering calls, and handling towing operations for the City of Belleville, IL.

9.      Plaintiff never received a write up or negative evaluation during her employment.

10.     Ms. Araiza served as a general supervisor for all secretaries and had the authority to report secretary performance or conduct issues to Defendant Clay.

11.     Defendant William Clay, III is the Police Chief and is the head of the chain of command for all employees in the department. Defendant Clay also has the ultimate decision-making authority regarding hiring, firing, or discipline for employees, including Plaintiff.

12.     Defendant Captain John Moody is a Police Captain and served as Plaintiff's direct supervisor. Defendant Moody assigned Plaintiff daily tasks and issued performance reviews. As a supervisor, Defendant Moody could also discipline and fire Plaintiff. During Plaintiff's employment, Defendant Moody was the only captain with a secretary.

13.     Defendant Moody was close friends with Defendant Clay and regularly reminded other employees he had a personal relationship with Defendant Clay. Defendant Moody regularly boasted about his authority to Plaintiff. He told Plaintiff, "I'm Captain Moody and I can do what I want."

14.     After Plaintiff began working with Defendant Moody, Defendant Moody told Plaintiff he punished employees he did not like.

15.     Defendant Moody told Plaintiff he sent "Elaine", a secretary he did not like, to the records department to punish her and get her away from him.

4

16.     Captain Moody also told Plaintiff he disliked Officer Ron Funk. Captain Moody told Plaintiff that even though Officer Funk tested highly on the detective exams, he would never promote Officer Funk to the detective department because he did not like him.

17.     Defendant Moody also threatened anyone who did not agree with him. He told Plaintiff, "If anyone crosses me, I'll do what I have to do to take care of them. You know what I mean?"  Defendant Moody told Plaintiff he paid home visits to persons who disagreed with him in the past to "take care" of the situation. He told Plaintiff he did not care about the consequences.

18.     Defendant Moody asked the department's dispatchers to "call him on the horn," referring to a non-recorded line. He did this so he could speak freely and without anyone else at the department listening to his conversations.

19.     After Plaintiff began working for Defendant Moody, he regularly called Plaintiff into his office to discuss his relationship with his girlfriend or discuss other personal matters with her. During these occasions, Plaintiff asked Defendant Moody if she could return to work since he did not have anything work-related to discuss. At least once, Defendant Moody demanded Plaintiff speak with his girlfriend on the phone and introduce herself.

20.     In the fall of 2017, Defendant Moody told Plaintiff he was watching her outside of the office. On several occasions, Defendant Moody described seeing her outside of the office and noted the color of Plaintiff's shirt and sunglasses. Defendant Moody also told Plaintiff he saw her with her husband several times out in public without her knowledge and he could tell whether they were getting along. It made Plaintiff uncomfortable to hear Defendant Moody watched her when she was not at work.

21.    Plaintiff overheard Defendant Moody and other department employees frequently make sexual jokes and comments, swear, and use sexual or otherwise profane language loudly in the workplace.

22.    At the beginning of December 2017, Plaintiff attended a sexual harassment training provided by Human Resources director Sherry Favre for the department's command staff. The command staff included the Defendant Clay, the Assistant Chief, their secretaries, Defendant Moody, Plaintiff, and Captain Eiskant. The training indicated sexually themed stories, language, or jokes could be considered sexual harassment in the workplace. This was the first time the department provided a training on sexual harassment in the workplace.

23.    Ms. Favre indicated other department employees would eventually receive the training, but Plaintiff never heard of the training happening again.

24.    After the training ended, Ms. Araiza rolled her eyes and loudly stated in a sarcastic tone that police department employees needed to stop talking about "sexual things" in the workplace. Others laughed in response.

25.    Other department employees, including Defendant Moody, also rolled their eyes and made faces at each other during the training as if it were a joke. Once Sherry Favre left the room after the training ended, the Assistant Chief, Defendant Moody, and Captain Eiskant laughed about the training.

26.    Plaintiff did not roll her eyes or laugh about the training unlike the other employees in the room.

**II. Sexual harassment and discrimination by other Belleville Police Department employees.**

27.     From the fall of 2017 through Plaintiff's last day of work, department employees regularly made sexual comments, jokes, and stories in Plaintiff's presence. These comments and jokes made it difficult for Plaintiff to focus and complete her job duties.

28.     Plaintiff's desk sat in an open floor space shared between Plaintiff and the detectives. Defendant Moody's office was next to Plaintiff's desk. The detectives' desks were located next to the copy machine and printer. Plaintiff could hear the detectives' conversations from her desk and when she walked by the detectives' work area to the copy machines.

29.     Plaintiff handled incoming calls for all the detectives. Due to the background noise, Plaintiff regularly paused calls and placed callers on hold so they would not overhear the comments and jokes by the detectives. These interruptions caused delays in Plaintiff's workload. Plaintiff also had difficulty reading and writing while listening to the jokes and comments. Because Plaintiff needed to answer phones all day long, she could not use headphones during work. Plaintiff did not have a private office or any other way to work in silence.

30.     These comments and jokes were often made during intentionally loud and raucous phone calls so other department employees could overhear the call and laugh. Civilians, other officers, other police departments, and family and friends of department employees called the department frequently. Plaintiff also overheard department employees loudly discussing sex, making sexual jokes, or using foul language with one another as well.

31.     For example, in November 2017, Plaintiff overheard Detective Timothy Crimm loudly ask a caller if she was Middle Eastern and whether she wore a headdress. Plaintiff overheard Detective Crimm state it turned him on to think he could have anal sex with her and cover up her face while he was "fucking" her.  Plaintiff did not say anything and tried to focus on her work.

7

32.     In January 2018, Plaintiff overheard Jamari Davis, a part-time department employee, loudly speaking to the sergeants about "sucking cock," while delivering documents to the records department. Plaintiff overheard Mr. Davis say it at least three times.

33.     Plaintiff found these comments offensive and knew from the sexual harassment training that they were impermissible. Plaintiff told Mr. Davis to watch his mouth after she heard him say it three times, but Mr. Davis did not stop.

34.     To make matters worse, Defendant Moody encouraged the employees to make sexually themed jokes and comments with each other. Defendant Moody actively participated and laughed at the jokes.

35.     For example, later in January 2018, Defendant Moody called Plaintiff into his office. Lieutenant Mark Heffernan was also in the office. Defendant Moody and Lt. Heffernan began to discuss "news anchor titties" with Plaintiff. Plaintiff told Defendant Moody it was disgusting and left the office. Defendant Moody and Heffernan laughed at Plaintiff as she walked away and continued to make the jokes.

36.     Defendant Moody did not stop making sexual jokes and comments to the other employees. Later in January 2018, Plaintiff overheard Defendant Moody laughing with Mr. Davis and another department employee about "wiping their butts," and discussing "sexy girls" at a local bar.

37.     The office environment became increasingly toxic when Defendant Moody joined in the harassment. At the end of February 2018, Plaintiff overheard Detective Crimm tell a caller he "wanted to ride bare back all night long, hitting the G spot over and over again." Many of the other detectives overheard the conversation and laughed hysterically during the call.

38.     Around the beginning of March 2018, Plaintiff overheard Detective Crimm on the phone again. Some of the comments Plaintiff overheard during that conversation included, "I busted a nut in your mother's badge" and "After I'm done banging your mother, can I bang you?" She also heard him ask a caller to "come cut his balls."

39.     In April 2018, Plaintiff overheard Detective Koebbe tell a caller to "fuck a camel" and called the caller "retarded." Later that month, Plaintiff overheard Detective Crimm tell a caller, "Everything is great.  I just got done shooting my wad on your mom's belly button and filled it up." Plaintiff also overheard another department employee ask someone on the phone whether their mother "likes big dicks in her butt."

40.     In May 2018, Plaintiff overheard Detective Koebbe tell a caller he liked to "fuck his mom's asshole" and loudly announced the caller's name and phone number so other department employees could call and say the same thing.

41.     That same month, Plaintiff also overheard Detective Koebbe and Captain Moody discuss blow jobs loudly from their desks while Plaintiff tried to complete a department-required computer exam. Defendant Moody laughed loudly at Detective Koebbe and made it difficult for Plaintiff to focus on her exam.

42.     In June 2018, Plaintiff overheard Detective Crimm tell a caller he was going to "bust a nut" in their mother. Later that month, Plaintiff overheard Detective Crimm tell a caller to "lick his balls." Plaintiff also overheard Detective Crimm discuss "doing goats" and ask an unidentified person whether they were "banging goats over there too."

43.     Many times when Plaintiff overheard the foregoing sexual comments or jokes when she walked by the detectives' desks, she asked the detectives to stop. They never did.

44.     By the late spring of 2018, Defendant Clay's secretary, Lynda Bohannon, approached Plaintiff about the jokes and comments. She told Plaintiff it was disgusting. Plaintiff agreed. Ms. Bohannon asked Plaintiff whether she heard the comments from her desk daily and stated she would be unable to work at Plaintiff's desk.

### III.     Sexual harassment and discrimination by Defendant Moody

45.     In addition to making and laughing at sexual jokes with other employees, Defendant Moody targeted Plaintiff directly with sexual harassment and threats. This began after the sexual harassment training ended in December 2017.

46.     Prior to the sexual harassment training, Defendant Moody did not make sexual jokes or comments toward Plaintiff.  However, after the training ended, Defendant Moody began to target Plaintiff because she did not go along with Defendant Moody's jokes about the sexual harassment training and because she refused to engage in the other sexual harassment in the office.

47.     In December 2017, several hours after the sexual harassment training ended, Defendant Moody stopped by Plaintiff's desk, looked at Plaintiff, laughed, and told Plaintiff she needed to stop sexually harassing him.

48.     For several weeks in December 2017, Plaintiff had a sore throat and a hoarse voice. Defendant Moody became fixated on the sound of Plaintiff's voice whenever she answered the work phones. Defendant Moody called Plaintiff into his office several times to tell her that the sound of her voice "would make anyone forget why the originally called." Defendant Moody even tried to mock Plaintiff's voice by speaking to her in a breathy, low voice when he talked.

49.     Plaintiff explained again and again to Defendant Moody that she was sick and had a sore throat and was not trying to distract callers. Plaintiff felt as if she could not speak out loud for fear of being sexualized and teased.

50.     On at least one occasion, Lieutenant Heffernan and Captain Eiskant were in Defendant Moody's office when Defendant Moody called Plaintiff in to make a joke about her voice being distracting for callers. Both men laughed at Plaintiff after Defendant Moody made the joke. Plaintiff left the office completely humiliated.

51.     Defendant Moody's obsession with Plaintiff's voice escalated. One day in late December 2017, Defendant Moody walked into the break room and tried to talk to Plaintiff about the sound of her voice while she ate her lunch. Plaintiff refused to engage in the conversation, kept her head down, and ate her lunch. Defendant Moody stared at Plaintiff while she ate and paced in circles around her. Plaintiff felt threatened by Defendant Moody. She quickly finished her lunch and went back to work.

52.     Defendant Moody also began to pry into Plaintiff's personal life. On February 14, 2018, Defendant Moody asked Plaintiff what her plans were for Valentine's Day. Plaintiff told Defendant Moody she did not wish to discuss her plans with him and walked away. Later, on February 20, 2018, Defendant Moody approached Plaintiff to discuss Valentine's day again. He asked Plaintiff to remind him what she did over the holiday. Plaintiff told Defendant Moody again that she did not wish to talk about it. Defendant Moody laughed at Plaintiff and asked Plaintiff if she was "having problems at home" and if her husband "treated her good on Valentine's day." Plaintiff told Defendant Moody her husband always treated her well, and she did not wish to discuss her personal life with him.

53.     Defendant Moody also involved other officers in his attempt to degrade and humiliate Plaintiff.

54.     In December 2017, Defendant Moody asked Plaintiff to look at Detective O'Dell's chest. Defendant O'Dell's shirt was slightly unbuttoned, and his chest showed through the top of

11

his shirt. Defendant Moody asked Plaintiff whether she thought Detective O'Dell's shaved chest was sexy. Plaintiff told Defendant Moody she wanted nothing to do with the conversation and walked away.

55.     In early February 2018, Defendant Moody asked Plaintiff to feel Detective Brown's face to see if she thought his shaved face was sexy. Plaintiff did not answer. Several other detectives overheard Defendant Moody and laughed at Plaintiff. Detective Brown did not laugh. Plaintiff said no. Plaintiff felt humiliated in front of her coworkers and walked away.

56.     On or about March 8, 2018, Detective Shea went to the gas station and asked if Plaintiff wanted anything. Defendant Moody stopped by Plaintiff's desk later that day and told Plaintiff that Detective Shea only asked because he was interested in Plaintiff. Plaintiff told Defendant Moody he was wrong. Defendant Moody did not let it go and told Plaintiff he knew he was right because "he knew people."

57.     Defendant Moody called Plaintiff "Angry Justine" and told her she "looked very angry" when she did not laugh at his jokes.

58.     The harassment continued through the spring and early summer. During the last several months of Plaintiff's employment, Defendant Moody called Plaintiff into his office multiple times for the sole purpose of making sexual jokes to Plaintiff or discussing the physical appearance of other women with Plaintiff.

59.     Plaintiff refused to engage in the jokes or conversations, and left Defendant Moody's office each time.

## IV.     Plaintiff's complaints about sexual harassment and discrimination

60.     Plaintiff became fed up with the sexual harassment and discrimination in the office. On March 12, 2018, Plaintiff told Ms. Araiza everything Defendant Moody said to her. Ms. Araiza

told Plaintiff it was harassment and told her to keep a flash drive recording what Defendant Moody said. Ms. Araiza suggested Plaintiff ask Defendant Clay to move her to the records department.

61.     Plaintiff told Ms. Araiza she did not wish to work in the records department. Ms. Araiza told Plaintiff during orientation the records department was an undesirable place to work. Other employees referred to the employees who worked in the records department as "crazy" and said the records department was full of "drama" and "gossip." Other employees stated the records department was one of the worst places to work in the department. Defendant Moody even told Plaintiff that working in the records department was a punishment. Plaintiff told Ms. Araiza she did not wish to work in the records department because it was a punishment and would damage her reputation among coworkers.

62.     Plaintiff also knew Defendant Clay was good friends with Defendant Moody. Plaintiff did not feel comfortable approaching Defendant Clay about the harassment. At that time, Plaintiff did not move to the records department.

63.     On the morning of March 13, 2018, Ms. Araiza told Plaintiff she should record Defendant Moody and show Defendant Clay the recordings. Ms. Araiza promised to "back Plaintiff up" to Defendant Clay if she ever complained about Defendant Moody. Plaintiff told Ms. Araiza she thought recording Defendant Moody was against the law in Illinois.

64.     In May 2018, Ms. Araiza assigned Plaintiff to work in the records department part-time. Plaintiff told Ms. Araiza she did not want to be punished for complaining, but Ms. Araiza told Plaintiff all secretaries would be sent to the records department part-time to assist with "work overflow."

65.     Shortly thereafter, Plaintiff began working in the records department for several hours a week to assist with the work overflow. Plaintiff continued to work for Defendant Moody while she was not in the records department.

66.     Plaintiff met Heather Kessler, a full-time employee in the records department. Ms. Kessler worked as a secretary in the police department prior to working in the records department. She worked closely with Defendant Moody and the other detectives.

67.     Plaintiff told Ms. Kessler what happened with Defendant Moody. Ms. Kessler told Plaintiff she also made a complaint about Defendant Moody several years prior for rubbing against her body at work and touching her. Ms. Kessler told Plaintiff the department "sent her away" to the records department as punishment after she complained.

68.     Defendant Moody continued to call Plaintiff into his office to harass her during the days she worked as his secretary. However, once Plaintiff began walking out of Defendant Moody's office, he became angry with Plaintiff. Defendant Moody began to yell at Plaintiff and treat Plaintiff worse than other secretaries. This began in sometime around May 2018.

69.     For example, in late May 2018, Defendant Moody arrived at work and immediately yelled at Plaintiff for wearing "fucking house shoes" and referred to her shoes as "fucking slippers." Plaintiff told Defendant Moody she was not wearing slippers. Defendant Moody stormed into his office and continued to swear.

70.     In early June 2018, Defendant Moody sent other secretaries from the department home early for the day but did not allow Plaintiff to leave. In the past, Defendant Moody told Plaintiff if one secretary was sent home early, it was policy to allow send all the other secretaries home early, to ensure fairness under their union contract.

14

71.     Each year, the department policy required employees to sign a form indicating they had not experienced sexual harassment that year. The form indicated there were additional materials describing "appropriate" and "inappropriate" conduct in the workplace. Plaintiff did not receive the additional materials.

72.     On June 6, 2018, Defendant Moody called Plaintiff into his office and provided Plaintiff with the sexual harassment form. Defendant Moody told Plaintiff to sign the form in front of him.

73.     Plaintiff told Defendant Moody she would not sign until she received the packet of additional materials describing what was considered "appropriate" or "inappropriate" conduct, identified in the form.

74.     Plaintiff wanted to review the materials to determine whether she should sign the form since Plaintiff felt she had experienced sexual harassment.

75.     Defendant Moody told Plaintiff he would only provide the materials after she signed the form. Plaintiff still refused to sign.

76.     Defendant Moody became visibly upset and raised his voice. Defendant Moody told Plaintiff she was "being ridiculous" and threw his hands up in the air. Defendant Moody told Plaintiff she had until July 23, 2018 to sign the form stating she had not been sexually harassed.

77.     Plaintiff took the form to her desk. As Plaintiff walked out of the room, Defendant Moody loudly slammed his fists on his desk in a threatening manner.

78.     The following day, on June 7, 2018, Defendant Moody called Plaintiff back into his office about signing the form.

79.     Defendant Moody stared at Plaintiff, narrowed his eyes, lowered his voice, and stated, "A certain amount of fear is good for people to have." Defendant Moody also told Plaintiff he would not write her a good review unless she signed the form.

80.     Plaintiff never signed the sexual harassment form.

81.     On June 8, 2018, Plaintiff went to Ms. Araiza a second time to complain about the harassment and discrimination by Defendant Moody and the other department employees. Ms. Araiza told Plaintiff to talk to Defendant Clay and the Human Resources office.

82.     Several weeks later, Officer Jill Zimmerman approached Plaintiff and asked what was wrong. Plaintiff told Officer Zimmerman she could not take working with Defendant Moody any longer. Officer Zimmerman told Plaintiff she used to record her conversations with Defendant Moody on her phone in case she ever needed to complain about him.

83.     Plaintiff became constantly nervous and physically sick at work. The deadline for providing the sexual harassment forms to Defendant Moody was approaching. Plaintiff decided she needed to take action before things became worse.

84.     On June 28, 2018, Plaintiff complained to Sherry Favre, the director of Human Resources, about the harassment and discrimination by Defendant Moody and the sexual harassment and discrimination by other department employees. Plaintiff told Ms. Favre she did not feel safe returning to work for Defendant Moody.

85.     During that meeting, Ms. Favre told Plaintiff to hand write a complaint about Defendant Moody and Ms. Araiza. Plaintiff provided Ms. Favre with a hand-written complaint during their meeting. Ms. Favre told Plaintiff she would scan and e-mail the complaint to Garett Hoerner, the City Attorney.

86.     Ms. Favre told Plaintiff what was happening was wrong, and that Plaintiff did the right thing by coming forward. Ms. Favre assured Plaintiff everything would be "worked out."

87.     Ms. Favre told Plaintiff she would follow up with her and told Plaintiff she could go home for the day after the meeting.

88.     On June 29, 2018, Plaintiff notified Ms. Favre that she would not be able to return to work because she Defendant Moody was still at work and might discover she complained about him.

89.     During that call, Ms. Favre's attitude toward Plaintiff suddenly changed. Ms. Favre told Plaintiff she needed to use her accrued sick time if she wished to take any additional time off. Ms. Favre also told Plaintiff she met with Mr. Horner, Defendant Clay, and Mayor Eckert to discuss Plaintiff's complaint. Ms. Favre told Plaintiff that Defendant Clay was "disappointed in her" for complaining about Defendant Moody.

90.     Earlier in the year, Plaintiff scheduled FMLA leave to take care of her daughter after a surgery in early July. Plaintiff took two weeks of FMLA leave in July 2018.

91.     During that time, Ms. Kessler told Plaintiff she received a department e-mail indicating Defendant Moody was on paid administrative leave.

92.     After Plaintiff's FMLA leave ended, Ms. Favre contacted Plaintiff and demanded Plaintiff return to work. Plaintiff told Ms. Favre she was terrified to return to work since no formal decision had been made regarding her complaints of harassment and discrimination, and since Defendant Moody was still employed by the department.

93.     Plaintiff was terrified Defendant Moody would demote her, fire her, or come to her house to physically harm her, as she believed he had done to others in the past.

17

94.     Plaintiff asked Ms. Favre if she could be placed on administrative leave, like Defendant Moody. Ms. Favre only gave Plaintiff three days of paid administrative leave.  After that, Ms. Favre told Plaintiff she needed to use her accrued time off if she wished to take more time off work. Plaintiff agreed.

95.     Around July 18, 2018, Ms. Favre told Plaintiff to sign an affidavit about her complaints, attached as Exhibit A. Plaintiff provided the affidavit to Ms. Favre describing, in detail, the sexual harassment and discrimination she experienced at work.

96.     On August 7, 2018, Plaintiff received a department-wide e-mail from Defendant Clay, indicating Defendant Moody would continue to work for the police department as commander of the Investigations Division.

97.     Defendant Moody continued to work at the Police Department. Sometime in mid-August 2018, Ms. Kessler told Plaintiff she saw Defendant Moody's vehicle in the parking lot at work.

## V.     Defendant's Response to Plaintiff's Complaints of Discrimination and Harassment

98.     On August 30, 2018, Defendant Clay sent Plaintiff a letter stating the City investigated her claims. The letter stated pursuant to the investigation, her claims of discrimination, sexual harassment, and a hostile work environment were not sustained.

99.     The letter stated that as a result of the investigation, Plaintiff would be moved to a new office on the third floor and report to Ms. Araiza. No action was taken against Defendant Moody.

100.     This solution was unacceptable and endangered Plaintiff. Defendant Moody had security clearance to most floors and offices in the building, including the third floor. Additionally, Defendant Clay's office was on the third floor. Defendant Moody went to Defendant Clay's office

nearly every day. If Plaintiff worked on the third floor, Plaintiff risked being confronted by Defendant Moody on a daily basis.

101.     Shortly after Plaintiff received the letter from Defendant Clay, Ms. Favre contacted Plaintiff and told her she was out of accrued time off and needed to return to work by September 4, 2018. Ms. Favre did not provide Plaintiff with a record of her accrued time off or available leave.

102.     Ms. Favre told Plaintiff she would be return to work in a segregated office in the third floor and work for Ms. Araiza. Plaintiff told Ms. Favre she did not feel safe knowing Defendant Moody could reach her in a sequestered space and had security clearance to her new office. Plaintiff told Ms. Favre she was afraid Defendant Moody would "take care of her" like he threatened to take care of anyone who crossed him. Plaintiff told Ms. Favre she would still see Defendant Moody in the hallways, breakroom, and when he visited Defendant Clay's office on the third floor.  Plaintiff told Ms. Favre something needed to be done to protect her from Defendant Moody and the other detectives or she could not return to work at the department. Finally, Plaintiff told Ms. Favre her doctor advised her not to return to work in that kind of environment.

103.     Ms. Favre did not offer Plaintiff any solutions or reassurance to Plaintiff's concerns. Instead, Ms. Favre asked Plaintiff if she was quitting her job. Plaintiff told Ms. Favre she did not want to quit, but she could not return to work unless she was protected from Defendant Moody. Plaintiff asked Ms. Favre to inform her when it was safe for her to return to work, and Ms. Favre ended the phone call.

104.     Plaintiff did not hear from Ms. Favre after the conversation ended.

105.     In early October 2018, Plaintiff received a letter in the mail sent by Defendant Clay dated September 27, 2018. The letter stated Plaintiff voluntarily resigned from her job.

106.    Defendant City of Belleville, Illinois, has a policy and practice of fostering a culture ripe with sexual harassment and discrimination, as seen by the unwelcome sexual advances and comments, and verbal abuse by its employees, including Defendant Moody.

107.    Defendant City of Belleville, Illinois has a policy and practice of discovering but failing to remedy ongoing sexual discrimination, harassment, and misconduct by its employees, including Defendant Moody.

108.    Defendant City of Belleville, Illinois has a policy and practice of allowing an employee code of silence, where its employees and others in the police chain of command refuse to report or otherwise cover-up instances of sexual misconduct and discrimination by its employees and others in the police chain of command, despite obligation under the law, thereby causing the type of injuries described above.

109.    As a proximate result of the of the sexual harassment, discrimination, and hostile work environment, and constructive discharge, Plaintiff has sustained lost wages and other benefits of employment, emotional distress such as pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, and stress.

**VIOLATIONS OF LAW**

**COUNT I**
**42 U.S.C. § 1983: Equal Protection**
**Against All Defendants**

110.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

111.    As described in more detail above, Defendants Moody and Clay denied Plaintiff equal protection of the law in violation of her rights under the Fourteenth Amendment of the Constitution of the United States.

20

112.    The misconduct described in this Count was motivated by gender and disability animus and constituted purposeful discrimination.

113.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

114.    This misconduct described in this Count was undertaken by Defendants Moody and Clay within the scope of their employment and under color of law such that their employer, Defendant City of Belleville, Illinois is liable for their actions.

115.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant City of Belleville, Illinois in the manner described more fully above.

**COUNT II**
**Title VII - Sex Discrimination and Retaliation**
**Against Defendant City of Belleville, IL**

116.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

117.    Plaintiff is an employee as defined by 42 U.S.C. § 2000e(f)

118.    Defendant City of Belleville, Illinois is an employer as defined by 42 U.S.C. § 2000e(b).

119.    As a supervisor, Defendant Moody had the power to take tangible employment actions against Plaintiff.

120.    Defendant Moody subjected Plaintiff to vulgar, humiliating, severe and pervasive harassment based upon her gender throughout her employment. His actions created a hostile working environment for Plaintiff.

121.    Further, Defendants Moody and Clay were aware of the harassment and discrimination by the detectives and other department staff, including Defendant Moody, but failed to take reasonable corrective measures to remedy the harassment and discrimination.

122.    As described above, Defendant City of Belleville, Illinois engaged in intentional gender discrimination in the terms and conditions of Plaintiff's employment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

123.    As described above, Defendant City of Belleville retaliated against Plaintiff for her opposition to the multiple instances of discriminatory abuse by Defendant Moody and other employees and for reporting sexual harassment and discrimination by its employees, in violation of 42 U.S.C. § 2000e-3(a).

124.    As a result of the intolerable hostile work environment, Plaintiff was unable to return to work for Defendant City of Belleville, constituting a constructive discharge.

125.    This misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

## COUNT III
### Illinois Human Rights Act - Sex Discrimination and Retaliation
### Against All Defendants

126.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

127.    Defendant City of Belleville, Illinois is an employer within the meaning of the IHRA, 775 ILCS 5/2-101(B)(1)(c).

128.    At all relevant times herein, Defendants Moody and Clay were Plaintiff's supervisors.

129.    Defendant Moody sexually harassed Plaintiff and violated the Illinois Human Rights Act ("IHRA") by engaging in continuous unwanted, unwelcome sexual jokes, comments, and advances toward Plaintiff, as described in more detail above. These actions created a hostile working environment for Plaintiff and adversely affected her performance, in violation of the IHRA, 775 ILCS 5/2-102(D).

130.    Defendants were aware of the sexual misconduct and hostile work environment created by the detectives and other department staff, including Defendant Moody, but failed to take reasonable corrective measures, in violation of the IHRA, 775 ILCS 5/2-102(D).

131.    As described above, Defendants further retaliated against Plaintiff for her opposition to the multiple instances of discriminatory abuse by Defendant Moody and other employees and for reporting the misconduct of Defendant Moody, in violation of the IHRA, 775 ILCS 5/6-101(A).

132.    As a result of the intolerable hostile work environment, Plaintiff was unable to return to work for Defendant City of Belleville, constituting a constructive discharge.

### CONCLUSION

133.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants John Moody, William Clay, III, and  City of Belleville, Illinois, awarding lost wages and benefits, reinstatement, front wages, emotional distress damages, compensatory damages, punitive damages, pre- and post-judgment interest, and attorney's fees and costs, as well as any other relief this Court deems may be just and proper.

### JURY DEMAND

134.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury on all issues triable by a jury.

By:   **KENNEDY HUNT, P.C.**

*/s/ MaryAnne Quill*
Thomas E. Kennedy
Sarah Jane Hunt
MaryAnne Quill
906 Olive St., Ste. 200
St. Louis, MO, 63101
314-872-9041 telephone
tkennedy@kennedyhuntlaw.com
sarahjane@kennedyhuntlaw.com
mquill@kennedyhuntlaw.com

24